Filed 3/27/14  P. v. Iuvale CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062725 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD235418) |
| TUFA IUVALE, JR. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Margie G. Woods, Judge.  Affirmed.

Kessler & Seecof, Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant Iuvale.

Robert Booher, under appointment by the Court of Appeal, for Defendant and Appellant Marin.

Kamala G. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Defendants Tufa Iuvale, Jr., and Susan Juarez Marin appeal from a judgment of conviction after jury trial. The jury convicted Iuvale and Marin of unlawfully taking and driving a vehicle and selling a stolen vehicle. On appeal, the defendants contend (1) that the trial court erred in ultimately allowing jurors to consider two statements made by a third person who had arranged the transaction, as acts in furtherance of a conspiracy, even though the court had previously ruled that the statements would be admitted only for the purpose of showing their effect on undercover officers; (2) that the uncharged conspiracy instructions permitted the jury to convict the defendants based on only a preponderance of the evidence; and (3) that the trial court denied them their right to present a defense by excluding the testimony of a woman to the effect that the man who arranged the transaction in this case had previously tricked her into delivering a stolen car to undercover officers. Marin also separately argues that the trial court erred in giving a jury instruction pertaining to adoptive admissions.

We conclude that none of the defendants' arguments requires reversal. We therefore affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *Factual background*

In early January 2011, Ryan Schwarz and her husband returned home from a vacation and discovered that Schwarz's 2000 Honda Civic had been stolen from the

2

parking garage of their condominium complex. The storage box next to the parking space had been broken into and several items had been taken, including a spare set of keys for the Civic.

Around that time, California Highway Patrol investigator John Clements was working undercover as part of the San Diego Regional Auto Theft Task Force (RATT). In early February 2011, Clements purchased a stolen Ford Expedition for $300 from Tom Thongsavanh, who goes by the nickname "Happy." During that transaction, Happy told Clements that he also had a 2000 Honda Civic for sale. In a subsequent conversation, Happy told Clements that he would sell the Civic to Clements for $330. Clements and Happy agreed to meet in the parking lot of a Walmart in Chula Vista on February 22 to conduct the transaction.

On February 22, Investigator Clements, accompanied by Detectives Rodney Demetrio and Jeff Raybould, arrived at the Walmart parking lot to meet Happy. However, Happy did not show up at the appointed time. After the law enforcement officers left the parking lot, Happy called Clements and said that he could not make it to the Walmart, but that his friend "Susie" would drop off the car. Clements said he would agree to meet Susie "as long as [she] was a trusted friend" of Happy's.

A person identifying herself as "Susie, Happy's friend," called Clements a short time later. Susie told Clements that she would be bringing the car to the Walmart parking lot when her husband was ready, presumably so that he could drive separately and she would have a ride after dropping off the Civic. Clements and Demetrio returned to the Walmart parking lot to wait for Susie to arrive. A woman later identified as Marin

3

arrived in an older model white BMW, and a man later identified as Iuvale arrived driving a maroon Honda Civic.

During the exchange, Clements said, "Hey I didn't even ask him[1]; does it have a key and shit?" Marin responded, "Yeah." Clements then said, "Oh fuck, good. I didn't bring anything to fuckin start it up with." Marin replied, "Yeah he does."[2]

Clements handed Iuvale the money. The following exchange then occurred:

"Clements: Shit. Are the plates good on it? You going to swap 'em out or anything?

"Iuvale: Get the um, get the other. There's a key [unintelligible] there.

"Clements: Are the plates hot or they swapped out or anything?

"Iuvale: They're swapped . . . they're not swapped out or anything.

"Clements: Okay. Cool."

Detective Demetrio observed that Iuvale appeared to be in a hurry during the transaction. Clements tried to arrange with Iuvale to purchase additional cars but expressed concern about not "jumping Happy's game." Demetrio asked Iuvale whether he "comes across this shit often." Iuvale indicated that he came across cars "[a]ll the time." Clements asked whether he could get in touch Marin and Iuvale at the number from which Marin had called him to arrange the meeting. Iuvale replied, "Yeah," and

---

1    From context, it appears that Clements is referring to his discussions with Happy regarding the Civic.

2    The video of the encounter demonstrates that in saying, "Yeah he does," Marin was saying that Iuvale had keys to the Civic.

then indicated that he would give Happy a commission on any deals that he made with Clements.

A video of this encounter, which was shown to the jury, demonstrates that Iuvale was not present when Clements inquired of Marin regarding the key; Iuvale arrived and got out of the Civic just as Clements said, "Oh fuck, good. I didn't bring anything to fuckin start it up with." However, both Iuvale and Marin were within hearing range during the rest of the exchange.

At trial, Investigator Clements testified that he believed the Honda Civic had been stolen because the price of the car, $330, was several thousand dollars less than the market value of the car. Other indicators that the car had been stolen included the fact that there was only a single key for the car, there was no alarm remote control, Iuvale and Marin participated in the conversation regarding whether the license plates had been switched, and the transaction was conducted without any paperwork. Clements believed that Iuvale and Marin had been in possession of the car for an extended period of time because Iuvale had the key to the Civic on a key ring with other keys. Based on Clements's training and experience, Clements believed that Marin knowingly participated in the sale of the stolen Civic, based on the fact that she knew the price that had been arranged with Happy, Happy had identified her as a "trusted friend" of his, she had identified herself as a friend of Happy's, and Happy sold stolen cars.

In late September 2011, Detective Raybould interviewed Iuvale. During the interview, Iuvale stated that Happy had asked him if he could keep the Civic at Iuvale's house, and Iuvale had agreed to keep the car at his house. After a couple of days, Marin

5

began complaining about the car. Happy had told Iuvale that the car belonged to someone who owed him money. Happy said that he would return the car to that person when the money was paid back. Happy later asked Marin whether she would drop off the car for him, and provided her with a cell phone number to call. Iuvale admitted that when he dropped off the car, the officers' questions made him think that the Civic was stolen. During the interview, Iuvale stated, "I'm not guilty you know, I guess I'm guilty of possession of a stolen car. Because I did have them. It is what it is, you know." He later said, "Like, like, like I said I can't deny it. I'm guilty of it."

B.    *Procedural background*

A San Diego County grand jury issued an indictment charging Iuvale and Marin with unlawfully taking and driving a vehicle (Veh. Code, § 10851, subd. (a); count 1) and selling a stolen vehicle (Pen. Code, § 496d; count 2).[3] The indictment also alleged that Marin had suffered three probation denial prior convictions (§ 1203, subd. (e)(4)), and that Iuvale had suffered multiple probation denial prior convictions (*ibid.*) and a prior strike conviction (§§ 667, subds. (b)-(i), 11790.12, 668), had served two prior prison terms (§§ 667.5, subd. (b), 668), and had previously been convicted of felony vehicle theft as to both charged counts (§ 666.5, subd.(a)).

Codefendant Tom "Happy" Thongsavanh was also charged with the two substantive counts, as well as additional enhancement allegations. In October 2011, Happy pled guilty to violating Vehicle Code section 10851, unlawfully driving a vehicle.

---

3    Further statutory references are to the Penal Code unless otherwise indicated.

6

The trial court took judicial notice of this fact, and the parties stipulated to having the jury hear about Happy's indictment and plea.

After a bifurcated trial, a jury found Iuvale and Marin guilty on both substantive counts. Iuvale admitted having suffered a strike prior conviction, two prior vehicle theft convictions, and two prison prior convictions.[4]

The trial court sentenced Marin to a three-year period of probation, with 240 days in custody. The court sentenced Iuvale to state prison for a five-year term.

Both defendants filed timely notices of appeal.

III.

DISCUSSION

A.   *Instruction regarding Happy's statements as evidence of an uncharged conspiracy*

Marin, joined by Iuvale, contends that the trial court erred in instructing the jury that it could consider Happy's statements to Investigator Clements as evidence of an uncharged conspiracy.

1.   *Additional background*

Prior to trial, the prosecutor moved to admit in evidence the conversations between Investigator Clements and Happy regarding the purchase of both the Ford Expedition and the Honda Civic. The first conversation occurred on February 8, 2011, during Clements's purchase of the stolen Expedition. During that transaction, Happy told Clements that he also had a Honda Civic for sale. The prosecutor argued that the

---

4    The record does not disclose what occurred with respect to the probation denial allegations as to either defendant.

7

statements were relevant to show Clements's state of mind—i.e., why Clements continued the investigation and ultimately arranged for the purchase of the Civic. The second conversation occurred on February 22, 2011, when Happy and Clements agreed on a price of $330 for the Civic, and agreed on the circumstances of the transaction. These statements include Happy's telephone call to Clements in which he told Clements that Marin would deliver the Civic to Clements and complete the transaction on Happy's behalf. The prosecutor argued that Happy's statements could be admitted for their truth because they were statements of a coconspirator made in furtherance of a conspiracy.

Both defendants' attorneys objected, arguing, inter alia, that the statements were hearsay and that their admission would violate the defendants' right to confront Happy, as well as their right to due process. Counsel noted that the February 8 statements were made during a transaction that did not involve the defendants, on a different date from the date of the transaction in this case.

After some questioning from the court, the prosecutor indicated that he did not intend to play the recording of the February 8 transaction between Happy and Clements, but instead, would have Clements testify regarding his prior interactions with Happy, including Happy's statements concerning the Civic being for sale. The trial court concluded that Happy's February 8 statements were admissible, not for their truth, but to show the effect of those statements on Clements. The court indicated that it would draft a limiting instruction to this effect.

With respect to the February 22 statement made by Happy regarding the fact that Marin would be delivering the Civic, the trial court acknowledged that the prosecutor's

argument that this statement could be admissible as the statement of a coconspirator had some merit, but the court expressed concern that the defense would not have the opportunity to cross-examine Happy about the statement, and that this might run afoul of the holding in *Crawford v. Washington* (2004) 541 U.S. 36 because the defense had not had an opportunity—and presumably would not have an opportunity—to cross-examine Happy. At that point, the court ruled that without further authority regarding the coconspirators' statements, Happy's February 22 statement to Clements would not be admitted.

The prosecutor then sought to have the February 22 statement admitted for the limited purpose of showing Clements's state of mind. The court indicated that it would allow the prosecutor to elicit Happy's statement to the effect that Marin would be delivering the car and to look for her, for the limited purpose of its effect on Clements, and said that the court would provide a limiting instruction to that effect.

Later, during discussions concerning the proposed jury instructions, the prosecutor requested that the court instruct the jury with instructions pertaining to an uncharged conspiracy, including CALCRIM No. 416, Evidence of an Uncharged Conspiracy; CALCRIM No. 417, Liability for Coconspirator Acts; CALCRIM No. 418, Coconspirator's Statements; and CALCRIM No. 419, Acts Committed or Statements Made Before Joining the Conspiracy. The prosecutor argued that the evidence presented at trial met the requirements for instructing the jury regarding an uncharged conspiracy.

Iuvale's attorney argued that there was not enough evidence of an uncharged conspiracy because Happy's statements had been admitted only for a limited purpose, i.e.,

9

to show why the detectives took further action in their investigation. Defense counsel contended that the prosecutor was attempting to "piggy-back" those statements into an uncharged conspiracy, which would be a wrongful use of that otherwise limited purpose evidence. Counsel further asserted that because the court had already indicated that it was going to instruct the jury on an aiding and abetting theory of liability, the uncharged conspiracy instructions would confuse them. Marin's attorney joined in these arguments, maintaining that there was not sufficient evidence to support the conspiracy instructions.

The prosecutor responded that there was ample evidence of a conspiracy between the two defendants, as well as one among the defendants and Happy. The prosecutor pointed out that Marin's call, in which she identified herself as Happy's friend, was evidence of an agreement between Marin and Happy. In addition, Iuvale made statements to Detective Raybould that indicated that Happy had provided him with the Civic, and Iuvale was supposed to sell it for Happy. From the evidence, the prosecutor argued, the jury could reasonably infer that Happy had given the car to the defendants and instructed them to go to the Walmart parking lot and "sell it for money for [him]." In addition, Iuvale's comments to the undercover officers to the effect that Happy would get his share of money if Iuvale and the officers were to enter into another transaction was evidence that something beyond mere association between the defendants and Happy existed.

After hearing further arguments from the attorneys, the court stated that whether there was an agreement between the parties was something that the trier of fact would have to determine. The court noted that the circumstantial evidence that had been

10

presented was sufficient for a jury to conclude that an agreement existed to sell a stolen car, and, as a result, the court had a duty to instruct with CALCRIM No. 416. The court went over the wording of the instruction with the attorneys and made changes and modifications that the court deemed necessary.

With respect to CALCRIM No. 417, regarding the liability of conspirators for the acts of a coconspirator, both defense attorneys objected to the instruction, arguing that it was unnecessary and that it would confuse the jury. The prosecutor argued that under the conspiracy theory, Iuvale's actions could be attributed to Marin, and this instruction would explain that to the jury. The trial court reserved ruling on whether to include CALCRIM No. 417.

The trial court then read the prosecutor's proposed CALCRIM No. 418 instruction regarding the use of a coconspirator's statements. The prosecutor explained that he was requesting this instruction because he wanted the statements of each of the coconspirators to be attributed to the other members of the conspiracy. Iuvale's attorney indicated a concern that the instruction be limited to statements that the coconspirator(s) made during the transaction, and not include statements that they later made to police. The prosecutor noted that the instruction regarding coconspirators' statements applies only to statements made during the life of the conspiracy. After no further objections were made, the court agreed to instruct the jury with CALCRIM No. 418 as requested by the prosecutor. Counsel and the court agreed that the court should give CALCRIM No. 419, regarding acts committed or statements made by a coconspirator prior to joining the conspiracy.

11

Before instructing the jury, the trial court informed the parties that after having reviewed the materials and having considered counsels' arguments, the court would give CALCRIM No. 417.

The trial court ultimately instructed the jury with CALCRIM Nos. 416, 417, 418, and 419 with respect to the uncharged conspiracy theory of liability, as well as with a modified version of CALCRIM No. 303, which limited the use of the evidence of Happy's statements.

The limiting instruction that the trial court gave pertaining to Happy's statements was as follows: "During the trial, certain evidence was admitted for a limited purpose. Namely, Detectives John Clements and Rodney Demetrio testified as to statements given by Tom 'Happy' Thongsavanh on February 8, 2011 and Detective John Clements testified as to statements given by Tom 'Happy' Thongsavanh on February 22, 2011, all relating to the sale of a year 2000 automatic Honda Civic with a key. You may consider that evidence only for the limited purpose of considering Detective Clements' state of mind in taking the follow-up investigative steps to purchase the Honda Civic in question in this case, and for no other."

The uncharged conspiracy instructions included CALCRIM No. 416, which set out the elements that the People had to prove to establish the existence of a conspiracy, including the requirement that one or more of the alleged coconspirators have committed at least one of seven specifically-identified overt acts in order to accomplish the charged crimes. The instruction informed jurors that, among other things, one member of a conspiracy is criminally responsible for the acts or statements of any other member of the

12

conspiracy if those acts or statements were done to help accomplish the conspiracy's goal. The instruction also informed jurors that mere association with a member of the conspiracy is insufficient to make someone a coconspirator if that person does not intend to commit the crime that is the goal of the conspiracy.[5]

---

[5] As given by the trial court, CALCRIM No. 416 provided, in relevant part:

"416. Evidence of Uncharged Conspiracy

"The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy.

"To prove that a defendant was a member of a conspiracy in this case, the People must prove that:

"1. The defendant intended to agree and did agree with the other defendant or Tom 'Happy' Thongsavanh to commit Unlawful Driving of a Vehicle (Vehicle Code section 10851(a)), as charged in Count 1 and Receiving, Concealing, Selling, or Withholding a Stolen Vehicle (Penal Code section 496d), as charged in Count 2;

"2. At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit Unlawful Driving of a Vehicle (Vehicle Code section 10851(a)), as charged in Count 1 and Receiving, Concealing, Selling, or Withholding a Stolen Vehicle (Penal Code section 496d), as charged in Count 2;

"3. One or both of the defendants, or Tom 'Happy' Thongsavanh committed at least one of the following overt acts to accomplish Unlawful Driving of a Vehicle (Vehicle Code section 10851(a)), as charged in Count 1 and Receiving, Concealing, Selling, or Withholding a Stolen Vehicle (Penal Code section 496d), as charged in Count 2[:]

"[¶] . . . [¶]

13

"4. At least one of these overt acts w[as] committed in California.

"To decide whether either defendant committed any of these overt acts, consider all of the evidence presented about the acts.

"To decide whether either defendant and one or more of the other alleged members of the conspiracy intended to commit Unlawful Driving of a Vehicle (Vehicle Code section 10851(a)), as charged in Count 1 and Receiving, Concealing, Selling, or Withholding a Stolen Vehicle (Penal Code section 496d), as charged in Count 2, please refer to the separate instructions that I will give you on those crimes.

"The People must prove that the members of the alleged conspiracy had an agreement and intent to commit Unlawful Driving of a Vehicle (Vehicle Code section 10851(a)), as charged in Count 1 and Receiving, Concealing, Selling, or Withholding a Stolen Vehicle (Penal Code section 496d), as charged in Count 2. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit either of those crimes. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

"An *overt act* is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime. The overt act must happen after the defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.

"You must all agree that at least one overt act was committed in California by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts.

"You must decide as to each defendant whether he or she was a member of the alleged conspiracy.

"The People contend that the defendants conspired to commit one of the following crimes: Unlawful Driving of a Vehicle (Vehicle Code

14

Among the list of seven distinct "overt acts" identified in the instruction were the

following:

> "1. Tom Happy Thongsavanh stated he would sell Detective
> Clements the Honda Civic for 330 dollars at the Walmart parking lot
> located [in Chula Vista].

> "2. Tom Happy Thongsavanh stated that he would not be able to
> deliver the Honda Civic personally but that his friend Susie would
> deliver the car."

CALCRIM No. 417, as adapted by the trial court, instructed the jury that a

member of a conspiracy is criminally responsible for the crimes that he or she conspires

to commit, regardless whether a coconspirator commits the crime, as well as for any act

---

> section 10851(a)), as charged in Count 1 and Receiving, Concealing,
> Selling, or Withholding a Stolen Vehicle (Penal Code section 496d),
> as charged in Count 2. You may not find a defendant guilty under a
> conspiracy theory unless all of you agree that the People have
> proved that the defendant conspired to commit at least one of these
> crimes, and you all agree which crime he or she conspired to
> commit.

> "A member of a conspiracy does not have to personally know the
> identity or roles of all the other members.

> "Someone who merely accompanies or associates with members of a
> conspiracy but who does not intend to commit the crime is not a
> member of the conspiracy.

> "Evidence that a person did an act or made a statement that helped
> accomplish the goal of the conspiracy is not enough, by itself, to
> prove that the person was a member of the conspiracy."

of another member of the conspiracy if that act is done to further the conspiracy and is a natural and probable consequence of the common plan or design of the conspiracy.[6]

With respect to the use of a coconspirator's statements, the trial court instructed the jury with the following adapted version of CALCRIM No. 418:

> "In deciding whether the People have proved that the defendants committed either of the crimes charged, you may not consider any statement made out of court by TUFA IUVALE Jr. or SUSAN MARIN unless the People have proved by a preponderance of the evidence that:

---

[6] CALCRIM No. 417, as adapted, informed the jurors:

"To prove that the defendant is guilty of the crimes charged in Counts One and Two [under the uncharged conspiracy theory], the People must prove that:

"1. The defendant conspired to commit one of the following crimes: Unlawful Driving of a Vehicle (Vehicle Code section 10851(a)), as charged in Count 1 and Receiving, Concealing, Selling, and/or Withholding a Stolen Vehicle (Penal Code section 496d), as charged in Count 2;

"2. A member of the conspiracy committed Unlawful Driving of a Vehicle (Vehicle Code section 10851(a)), as charged in Count 1 and Receiving, Concealing, Selling, or Withholding a Stolen Vehicle (Penal Code section 496d), as charged in Count 2 to further the conspiracy;

"AND

"3. Unlawful Driving of a Vehicle (Vehicle Code section 10851(a)), as charged in Count 1 and Receiving, Concealing, Selling, and/or Withholding a Stolen Vehicle (Penal Code section 496d), as charged in Count 2 were[] natural and probable consequence[s] of the common plan or design of the crimes that the defendant conspired to commit."

16

"1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made;

"2. TUFA IUVALE Jr. or SUSAN MARIN were members of and participating in the conspiracy when they made the statement;

"3. TUFA IUVALE Jr. or SUSAN MARIN made the statement in order to further the goal of the conspiracy;

"AND

"4. The statement was made before or during the time that the defendants were participating in the conspiracy."

Finally, with respect to the uncharged conspiracy instructions, the court gave CALCRIM No. 419, which tells the jury that a defendant is not responsible for any acts that were done before he or she joined the conspiracy, although the jury may consider evidence of acts done or statements made before a defendant joined the conspiracy to show the nature and goals of the conspiracy.

2.    *Analysis*

Marin argues that the trial court erred when it instructed the jury that it could consider Happy's February 6 and February 22 statements as evidence of a conspiracy under CALCRIM No. 416. Specifically, Marin contends that the trial court had ruled in response to the prosecution's in limine motion regarding the statements that the "relevant statements were admissible only to explain the actions taken by Clements and other officers," and provided the jury with a limiting instruction to this effect, but then also instructed the jury that it could consider "the relevant statements as potential requisite overt acts." According to Marin, the conspiracy instruction "nullified" the limiting instruction, and therefore, "a reasonable juror could . . . ignore the limiting instruction

17

and consider Happy's statements to Clements for whatever purpose [the juror] deemed proper."

Iuvale joins in this argument, contending that the "allegations in the conspiracy instruction conflicted with the specially tailored limiting instruction concerning Happy's statements." According to Iuvale, the court's "conspiracy jury instruction effectively nullified the trial court's in limine ruling [regarding the use of Happy's statements] and rendered meaningless the corresponding limiting instruction." Iuvale further argues that the court erred in the manner in which it modified CALCRIM No. 418, because the court did not instruct the jury that Happy was one of the alleged coconspirators. He argues that the jury "did not know that it had to find '[s]ome evidence other than the statement itself' of a conspiracy before it could use Happy's statement as evidence of appellant's guilt." He also asserts that "no evidence supported a finding that Happy and appellant were members of a conspiracy at the time that Happy spoke to Clements on February 8, 2011, to support element 1 of the instruction."

Assuming that the defendants are correct in their assertion that the trial court erred in instructing the jury with respect to Happy's statements and the uncharged conspiracy, they cannot establish that they were prejudiced by the court's giving both the limiting instruction and the uncharged conspiracy instructions (particularly the instruction regarding use of a coconspirator's statements), under either the more lenient standard of harmless error review announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 for

review of state law error, or the more rigorous standard announced in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) for review of federal Constitutional error.[7]

Under *Chapman*, the state must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  (*Chapman*, *supra*, 386 U.S. at p. 24.)  " 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'  [Citation.]"  (*People v. Neal* (2003) 31 Cal.4th 63, 86.)  "The reviewing court conducting a harmless error analysis under *Chapman* looks to the 'whole record' to evaluate the error's effect on the jury's verdict."  (*People v. Aranda* (2012) 55 Cal.4th 342, 367 (*Aranda*).)  "We note in this regard that a *Chapman* harmless error analysis for instructional error typically includes review of the strength of the prosecution's case."  (*Ibid.*)

Contrary to the defendants' claims, the evidence against them was quite strong.  In fact, the video of the encounter involving Marin, Iuvale, and the two undercover officers provides significant evidence that both Marin and Iuvale were clearly aware that they were in possession of a stolen vehicle and were selling a stolen vehicle.  Specifically, the video shows that Marin and Iuvale engaged in a conversation with the undercover detectives in which they both indicated they knew they were delivering a stolen car that day.  For example, at one point, Clements said, "Hey I didn't even ask him; does it have a

---

7        Although the parties disagree as to the proper standard of harmlessness review that applies, we conclude that it is of no consequence, since we would reach the same conclusion under either standard.

key and shit?" Marin replied, "Yeah." Clements then said, "Oh fuck, good. I didn't bring anything to fuckin start it up with." Marin responded, "Yeah he [Iuvale] does." There would be no reason to question whether Marin and Iuvale had a key for a vehicle that they were legitimately selling or returning to its owner. The clear implication of Clements's statement was to suggest that the car had not been obtained legally.[8] In addition, after Clements handed Iuvale the money for the car, Clements said, within earshot of both defendants, "Shit. Are the plates good on it? You going to swap 'em out or anything?" When neither Iuvale nor Marin immediately responded, Clements then essentially repeated the question, asking, "Are the plates hot or they swapped out or anything?" Iuvale responded by saying, "They're swapped . . . They're not swapped out or anything." The defendants' responses to Clements's questions demonstrate an understanding on the part of both defendants that the car was stolen, since there would be no need to "swap" out plates, or to inquire whether the plates were "hot," unless the car had not been legally obtained. Neither defendant questioned why Clements was asking questions that implied that the car was stolen. Instead, they answered his questions directly or remained silent, without expressing surprise or inquiring about Clements's implication.

Beyond this, the transaction did not involve any paperwork at all, such as would be required for the legitimate sale of a vehicle. Further, the defendants knew the amount of money that Clements was to give to them was $330; Marin was the first person to

---

8        We address Marin's contention with respect to the court's instruction on adoptive admissions related to this statement in part III.D., *post*.

20

bring up the subject of money when she asked Clements whether Happy had "told [him,] what[,] 330." This far-below-market sale price, as well as the brevity of the entire transaction, which took no more than 127 seconds, were also both circumstantial evidence that this transaction involved the sale of a stolen vehicle.[9] Further, the undercover officers went on to attempt to arrange more deals with Iuvale while the group was standing together between two parked cars, and during this discussion, the defendants again implicated themselves. Clements expressed concern about not "jumping Happy's game," while Demetrio asked Iuvale whether he "comes across this shit often." Iuvale indicated that he came across it "all the time." Clements asked whether he could get in touch with Marin and Iuvale at the number from which Marin had called him. Iuvale said, "Yeah," and then indicated that he would give Happy a commission on any deals that he made with the undercover officers.

In addition, during his interview with Detective Raybould months after the transaction, Iuvale essentially admitted that he was guilty of driving and selling a stolen vehicle. Marin's conduct, in telephoning Clements and arranging the meeting in the Walmart parking lot, arriving there with Iuvale, taking part in the conversations, and having Iuvale accompany her in another vehicle so that they could leave the Civic with Clements, constitutes significant evidence that Marin, at a minimum, aided and abetted

---

[9] Although Iuvale attempted to claim during his interview with Detective Raybould that his understanding was that Happy had been holding onto a friend's car until the friend paid Happy money that was owed to Happy, Iuvale's statements to the undercover officers during the transaction indicate that he did not believe that he was simply returning a car to Happy's friend upon repayment of a debt.

21

Iuvale in committing the offenses for which both were convicted, and that she was aware that she and Iuvale were involved in driving and selling a stolen car.

We conclude that the jury would have found both defendants guilty of the charged crimes even in the absence of any presumed instructional error regarding an uncharged conspiracy and any possible conflict between those instructions and the limiting instruction that the trial court gave with respect to the jury's use of Happy's statements to Clements.

B. *The conspiracy instructions did not lessen the prosecution's burden of proof*

Marin, joined by Iuvale, argues that the combined effect of the conspiracy instructions (CALCRIM Nos. 416, 417, and 418) lowered the prosecution's burden of proof, and thus violated her constitutional rights to due process and to conviction by proof beyond a reasonable doubt. Specifically, the defendants contend that the conspiracy instructions allowed the jury to find the existence of a conspiracy without having to determine that the prosecution had proven every element of a conspiracy beyond a reasonable doubt. The defendants' argument rests on the fact that one of the instructions pertaining to the uncharged conspiracy, CALCRIM No. 418, allows the jury to consider an out-of-court statement made by one of the conspirators as long as the People have proven by a preponderance of the evidence that some other evidence, beyond the statement itself, establishes that a conspiracy existed at the time the statement was made, the defendants were members of and participating in the conspiracy at the time the statement/s was/were made, the statement/s was/were made in order to further the conspiracy, and the statement was made either before or during the time that the

22

defendants were participating in the conspiracy. The defendants claim that because this instruction informed the jury that it had to conclude by only a preponderance of the evidence standard that Marin and Iuvale "were members of and participating in the conspiracy," a reasonable juror "could have understood the instructions as allowing the jury to convict appellant[s] based on the jury finding by a preponderance of the evidence that a conspiracy existed."

" ' "In reviewing [a] purportedly erroneous instruction[], 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citation.] In conducting this inquiry, we are mindful that ' "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' [Citations.]" [Citation.]' " (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1320-1321 (*Castaneda*).) Thus, " 'the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citations.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 192.) " ' "Additionally, we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.]" (*Castaneda*, *supra*, at p. 1321.)

" 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 822.)

The trial court instructed the jury with respect to an uncharged conspiracy as a theory of the defendants' guilt as described in part III.A.1, *ante*. Again, with respect to the use of a coconspirator's statements, the trial court instructed the jury with an adapted version of CALCRIM No. 418, as follows:

> "In deciding whether the People have proved that the defendants committed either of the crimes charged, you may not consider any statement made out of court by TUFA IUVALE Jr. or SUSAN MARIN unless the People have proved by a preponderance of the evidence that:
>
> "1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made;
>
> "2. TUFA IUVALE Jr. or SUSAN MARIN were members of and participating in the conspiracy when they made the statement;
>
> "3. TUFA IUVALE Jr. or SUSAN MARIN made the statement in order to further the goal of the conspiracy;
>
> "AND
>
> "4. The statement was made before or during the time that the defendants were participating in the conspiracy."

This instruction also included the following explanation regarding what proof by a preponderance of the evidence means: "*Proof by a preponderance of the evidence* is a different standard of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true."

In addition to the instructions related to uncharged conspiracies, the jury was also instructed with CALCRIM No. 220, regarding the reasonable doubt standard, as follows:

24

"A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. *Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.*

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." (Italics added.)

The defendants contend that the trial court's giving CALCRIM No. 418 may have led the jury to believe that it could convict them by finding by only a preponderance of the evidence that a conspiracy existed. We reject this contention.

First, the defendants were not charged with conspiracy. Rather, they were charged with two substantive offenses—unlawfully taking and driving a vehicle and selling a stolen vehicle—and one theory of their guilt as to those two offenses was that they participated in an uncharged conspiracy, the goal of which was to sell a stolen vehicle. Further, it is clear that the instruction in which the court explained the preponderance of the evidence standard was merely an instruction telling the jury when it could consider the statements made by potential coconspirators against the other defendants, *not* an instruction regarding what the jury would have to find in order to convict the defendants of the charged crimes on the theory that they participated in an uncharged conspiracy to commit the crimes. With respect to the instructions that informed the jury about how to decide whether the defendants were guilty of the charged crimes based on the theory that they participated in an uncharged conspiracy to commit the crime, i.e., CALCRIM Nos. 416 and 417, the instructions stated simply that the People would have to prove certain

25

elements, and CALCRIM No. 220 expressly told the jury, "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise." Thus, the jury was clearly instructed that it had to find that the People had proven the existence of a conspiracy beyond a reasonable doubt in order to find the defendants guilty of the substantive crimes with which they were charged based on the uncharged conspiracy theory of guilt. The conspiracy instructions, when considered with the other instructions provided to the jury, did not reduce the prosecution's burden of proof.

The cases on which defendants rely are inapplicable. For example, in *United States v. Gray* (1980) 626 F.2d 494, 500 (*Gray*), the trial court initially provided a correct instruction on conspiracy, but then added language to the instruction that told the jury that "[t]he Government need only introduce *slight evidence* of a particular defendant's participation, once the conspiracy is established, but must establish beyond a reasonable doubt that each member had a knowing, special intent to join the conspiracy. Mere association with a conspirator, of course, is not enough." (Italics added.) The court in *Gray* concluded that the trial court's "slight evidence" reference "can only be seen as suffocating the 'reasonable doubt' reference." (*Ibid.*) Similarly, in *United States v. Hall* (1976) 525 F.2d 1254, 1255, the trial court instructed the jury that " 'when a conspiracy has been established by competent proof, only slight evidence is necessary to connect a person with the conspiracy.' " The *Hall* court explained that although the trial court's instruction regarding "slight evidence" did "correctly describe[] the standard a *court* should use to determine whether the evidence against a particular defendant supports

26

submission of his case to the jury, . . . the language should not be used in the charge to a jury." (*Id*. at pp. 1255-1256.) In this case, the instruction that the trial court gave regarding use of a coconspirator's statements was a proper statement of the standard of proof required to permit the jury to consider statements that would otherwise have been excluded as hearsay. The trial court did not include any language in its instruction that undermined the instruction that the reasonable doubt standard applied to the substantive conspiracy instructions.

This case is similar to *People v. Jourdain* (1980) 111 Cal.App.3d 396 (*Jourdain*). The defendant in *Jourdain* argued that under CALJIC No. 6.24 (the CALJIC instruction regarding use of a coconspirator's statements), the jury could have found him guilty of a conspiracy "upon a lower standard than beyond a reasonable doubt." (*Jourdain, supra,* at p. 402.) The instruction provided by the trial court in *Jourdain* included the following:

> " 'Any evidence of a statement made by one alleged conspirator other than at this trial shall not be considered by you as against another alleged conspirator unless you shall first determine from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed and unless you shall further determine that the statement was made while the person making the statement was participating in the conspiracy and before or during the time the person against whom it was offered was participating in the conspiracy and, finally, that such statement was made in furtherance of the objective of the conspiracy.' " (*Id*. at p. 403.)

In response to the defendant's argument that the trial court's having instructed the jury with CALJIC No. 6.24 permitted the jury to find him guilty of a conspiracy upon a lower standard than proof beyond a reasonable doubt, the *Jourdain* court said, "That argument misses the point. The People had not charged appellant with, nor were they

27

trying to convict him of, conspiracy. The conspiracy theory was merely 'a vehicle for using otherwise inadmissible hearsay evidence against' appellant by the use of the coconspirator exception to the hearsay rule.' [Citation.]" (*Jourdain*, *supra*, 111 Cal.App.3d at p. 403.) Thus, once "there had been proof of the existence of the conspiracy, there was no error in instructing the jury on the law of conspiracy." (*Id*. at p. 404.) The *Jourdain* court concluded that the conspiracy instructions, including CALJIC No. 6.24 "did not tell the jury it could find appellant guilty upon less than reasonable doubt." (*Ibid*.) Rather, as in this case, "[t]here was only one instruction on the burden of proof given to the jury. That instruction told the jury . . . that it could not find appellant guilty until his guilt had been proved beyond a reasonable doubt. [Citation.] Notwithstanding appellant's protestations to the contrary, CALJIC No. 6.24 did not allow appellant to be convicted upon a showing of less than a reasonable doubt." (*Jourdain*, *supra*, 111 Cal.App.3d at p. 404.)

Defendant Marin attempts to distinguish *Jourdain* from this case by suggesting that the language in CALJIC No. 6.24 differs from the language in CALCRIM No. 418 in a substantive way. For example, she contends that CALCRIM No. 418 "more explicitly guides the jury to decide whether there was a conspiracy 'by a preponderance of the evidence,' " and then allows the jury to consider the statements of a coconspirator, whereas CALJIC No. 6.24 tells the jury first that it should not consider a statement made by one alleged conspirator against another alleged conspirator unless the jury determines by a preponderance of the evidence that a conspiracy existed. She also points out that the titles of the two instructions differ. According to Marin, the title of CALJIC No. 6.24,

" 'Determination of Admissibility of Co-Conspirator's Statements,' " "expressly limits the purpose of the instruction to a determination of admissibility," whereas the title of CALCRIM No. 418, "Coconspirator's Statements," does not. These minor distinctions between the two instructions that address the same point of law are not sufficiently substantive to cause us to conclude that the *Jourdain* court's reasoning does not apply in this case. The opinion in *Jourdain* supports our conclusion that the conspiracy instructions, when considered in full and with the other instructions provided to the jury, did not reduce the prosecution's burden of proof.

C.      *The trial court properly excluded the testimony of Kassandria Villareal*

The defendants both contend that the trial court erred in excluding the testimony of a proposed defense witness, Kassandria Villareal, regarding her involvement in the selling of a stolen Ford Expedition.

1.      *Additional background*

After Detective Raybould testified, Iuvale's counsel informed the trial court that Villareal was Happy's former girlfriend, and that she had picked up Happy after he completed the previous sale of the Ford Expedition to undercover officers. Counsel stated that Villareal could testify that Happy had told her that the Expedition belonged to a very good friend of his, and that he was selling it to another good friend in order to "help a friend out." Villareal would also testify that she did not know that the Expedition was stolen. Iuvale's counsel explained that Villareal's statements were relevant to the defense in this case because Iuvale had at one point told officers that Happy had told him that the Civic was not stolen and that he had "nothing to worry about." After noting a

29

concern as to whether Villareal would be represented by counsel and whether her testimony might raise Fifth Amendment issues, the trial court reserved ruling with respect to whether to admit Villareal's testimony.

At the close of the prosecution's case-in-chief, the trial court revisited the issue. The court asked Iuvale's attorney to address the relevance of Villareal's testimony, and whether any relevance might be outweighed by undue prejudice, the potential for misleading or confusing the jury, or the possibility that it would constitute an undue consumption of time. Counsel repeated the offer of proof that he had provided at the beginning of trial as to what Villareal would say. Counsel argued that this evidence was relevant to the question whether Marin and Iuvale knew that the Civic was stolen, particularly since the People had introduced Iuvale's recorded statement in evidence. Counsel further contended that Villareal's testimony would show that Iuvale was credible when he claimed that he did not know that the Civic was stolen because of what Happy had told him. Marin's counsel joined in these arguments. Both attorneys said that the questioning would take only a short time.

The prosecutor argued that the evidence was hearsay with respect to what Happy had said to Villareal, and that it was being offered to establish Iuvale's state of mind, but that the only way that evidence of Iuvale's state of mind could be admitted was through Iuvale himself. The prosecutor also argued that the People had introduced Happy's statements made on the day of the Ford Expedition transaction for the limited purpose of establishing Clements's state of mind, i.e., why he took the investigative steps that led to the February 22 Honda Civic transaction. The prosecutor said that its introduction of

30

Happy's statements had not opened any doors beyond this limited purpose, and that the defense was attempting to amplify the evidence regarding the February 8 transaction, which did not involve these defendants.[10] The prosecutor also questioned the possible relevance of Villareal's testimony, given that she had been Happy's girlfriend. He contended that what a person might tell a girlfriend would not necessarily be the same thing that a person would tell a business partner.

The trial court noted that Villareal's testimony was potentially relevant to bolster the defense's position that Happy told Iuvale that the owner of the car owed Happy money, since the proffered testimony suggested by inference that Happy told lies that were reasonably believed. However, the court further stated that allowing Villareal to testify as proffered would open the door to having the jury trying to assess whether Villareal reasonably could have believed what Happy told her, and that this could be misleading and confusing for the jury. The issue for this jury to decide was whether Iuvale and Marin intended to sell a vehicle that they knew was stolen. Although Villareal's testimony was somewhat relevant, that relevance was outweighed by its prejudicial effect because the jury would have to decide what happened between Villareal and Happy, and in so doing would be deciding facts not related to this case. This, the court concluded, would confuse and mislead the jury as to their task in the trial, and would consume an undue amount of time.

---

10     Later, the trial court agreed to instruct the jury that the statement that Happy made on the date of the Ford Explorer transaction to the effect that he would sell Clements a Honda Civic for $330 could also be considered as evidence of an overt act in furtherance of an uncharged conspiracy involving Iuvale and Marin.

The trial court also noted that the issue in this case was the state of mind of the defendants, not Villareal's state of mind, and that the defendants' state of mind could not be proven by the state of mind of another individual who had been involved in a separate transaction. Thus, the trial court concluded, Villareal's testimony was "too far removed from this case," and would not be admitted.

2.    *Analysis*

A trial court has broad discretion to exclude relevant evidence under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid.*; see also *People v. Lee* (2011) 51 Cal.4th 620, 643.) Given the broad discretion granted to a trial court pursuant to Evidence Code section 352, "[w]e review for abuse of discretion a trial court's rulings on relevance and the exclusion of evidence under [that] Evidence Code section." (*People v. Hamilton* (2009) 45 Cal.4th 863, 944.)

On this record, we cannot conclude that the trial court abused its discretion in not allowing the defense to call Villareal to testify. The court was justifiably concerned with the fact that if Villareal were permitted to testify, the jury's focus would have been directed toward determining what happened during the February 8 sale of the stolen Ford Expedition—a transaction for which the defendants had not been charged. The court could have reasonably concluded that allowing this testimony would have unnecessarily distracted the jury from its true charge—i.e., to determine the defendants' state of mind. Further, the defense was attempting to place in evidence certain hearsay statements

purportedly made by Happy to Villareal. The hearsay exception on which the defense was relying was that Happy's statements would be used to establish Villareal's state of mind; however, Villareal's state of mind is not directly relevant to the main issue in this trial, i.e., the defendants' state of mind. Given the limited relevance of this evidence, together with the possible confusion of issues, the trial court acted within its discretion in denying the defense request to call Villareal as a witness to testify about what Happy had told her regarding a separate transaction.

D.   *The trial court did not prejudicially err in instructing the jury regarding adoptive admissions*

Marin contends that the trial court violated her due process rights by instructing the jury that it could consider her failure to object to Clements's questioning to be an adoptive admission.

The prosecutor requested that the court instruct the jury with CALCRIM No. 357, titled "Adoptive Admissions," and argued that Marin and Iuvale made adoptive admissions by not protesting Clements's question regarding whether there were keys to the car, Clements's response when Marin said that Iuvale did have keys, i.e., "good, because I didn't bring anything to start it," and Clements's question whether the license plates had been swapped out. Counsel for both defendants asserted that the statements made by Clements did not qualify as adoptive admissions because they were not sufficiently accusatory to constitute statements that would tend to connect the defendants to the crime. At that time, the court indicated that the issue was not "clear-cut" and put off deciding the issue until a later time.

33

After the trial court later indicated that its tentative ruling was that it would instruct the jury regarding adoptive admissions, Marin's attorney argued that the statements were not sufficiently affirmative or accusatory to be interpreted as adoptive admissions.[11] The court explained that in its view, the determining factors were whether the statements were akin to an accusation or a conclusion, and whether they tended to connect Marin with the commission of a crime. The court determined that although Clements's statements were vague, they were not so vague that an adoptive admission instruction should not be given. The court concluded that it would give the requested instruction, reasoning that it was up to the trier of fact to determine whether there was an adoptive admission. The trial court instructed the jury with CALCRIM No. 357, as follows:

> "If you conclude that someone made a statement outside of court that tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true:
>
> "1. The statement was made to the defendant or made in his or her presence;
>
> "2. The defendant heard and understood the statement;
>
> "3. The defendant would, under all the circumstances, naturally have denied the statement if he or she thought it was not true;
>
> "AND

---

11    Marin also argued that the evidence did not show that she heard the question about the swapped out plates and/or that she understood the question. However, the instruction allows the jury to consider whether the evidence establishes that these factors have been met. The evidence was sufficient to support a conclusion that Marin both heard and understood Clements's questions.

34

"4. The defendant could have denied it but did not.

"If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true.

"If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

The adoptive admission instruction is based on an exception to the hearsay rule: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."  (Evid. Code, § 1221.)

" 'If the accused responds to the [accusatory statements] with a flat denial, there is no admission and hence nothing that may be received in evidence.  If, on the contrary, the truth of the statement is admitted, the statement may properly be introduced.  A third situation is presented when the accused stands mute in the face of the accusation or responds with an evasive or equivocal reply.  In that situation this court has held that *under certain circumstances* both the statement and the fact of the accused's failure to deny are admissible on a criminal trial as evidence of the acquiescence of the accused in the truth of the statement or as indicative of a consciousness of guilt.'  [Citation.]"  (*People v. Vindiola* (1979) 96 Cal.App.3d 370, 380.)

"The theory underlying this rule is that the natural reaction of an innocent man to an untrue accusation is to enter a prompt denial.  Where his response is silence, evasion, or equivocation, it is for the trial court to determine in the first instance whether the

35

accusation has been made under circumstances calling for a reply, whether the accused understood the statement, and whether his conduct or response was such as to give rise to an inference of acquiescence or guilty consciousness.  Where the trial judge determines that such an inference may be drawn, the statement is then admitted, not as substantive evidence in proof of the fact asserted but merely as a basis for showing the reaction of the accused to it."  (*People v. Simmons* (1946) 28 Cal.2d 699, 712-713.)

Marin contends that the statements Clements made to her and Iuvale, and her responses—or nonresponses—to those statements, did not meet the requirements of the adoptive admissions exception because Clements's statements/questions to the defendants were ambiguous and were not clearly accusatory, and her responses did not implicate her in any wrongdoing.

"To warrant admissibility [pursuant to the adoptive admission exception], it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide."  (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1011 (*Edelbacher*).)  We see no error in the trial court concluding that a reasonable jury could have found that under the circumstances presented here, Marin's responses to Clements, as well as her silence, constituted adoptive admissions.  Again, Clements asked Marin, "[D]oes it have a key and shit?"  Marin responded immediately, saying, "Yeah."  Clements then said, "Oh fuck, good.  I didn't bring anything to fuckin start it up with."  Marin responded, "Yeah he [Iuvale] does."  The clear inference from Clements's

36

statements is that the car that he was about to take possession of had been stolen. Although these statements were not direct accusations, a reasonable person could conclude that they tended to connect Marin to the knowing possession of, and/or selling of a stolen car by demonstrating her knowledge that the car was stolen. The video shows that Marin immediately, and without asking any questions, indicated that the car did have a key and that Iuvale had the key. A reasonable person could conclude that Marin's responses were not the responses of an innocent person who believed she was engaging in a legitimate exchange of a car.

In addition, the video shows that after Clements handed Iuvale the money for the car, Clement asked both defendants, "Shit. Are the plates good on it? You going to swap 'em out or anything?" When he received no response to that inquiry, Clements asked, "Are the plates hot or they swapped out or anything[?]" Iuvale responded, but Marin remained silent. Again, the clear implication of Clements's question whether the plates were "hot" or were "swapped out" was that the car had been stolen. These questions were more accusatory than Clements's question about the key, yet Marin remained silent in the face of these questions, asked no questions herself in response, and did not attempt to deny that the plates would have to be swapped out or that they were "hot."

The evidence supports a reasonable inference that Clements's questions implied that the Civic had been stolen, and that Marin had a fair opportunity to register an explanation or deny the implication of Clements's questions. Thus, whether Marin's responses to these questions constituted an adoptive admission was a question for the jury to decide. (*Edelbacher*, *supra*, 47 Cal.3d at p. 1011.)

37

Further, the instruction at issue is cautionary, in that it generally protects a defendant from jurors giving unwarranted weight to an ambiguous answer or to a reply that the jury does not find to be a denial of an accusatory statement. (See *People v. Avalos* (1979) 98 Cal.App.3d 701, 711 [error not to give cautionary instruction on adoptive admissions where defendant's response could be construed as a "tacit admission" or as a denial].) Thus, even if Clements's questions would not have been understood by Marin to be accusations, or, alternatively, if Marin's responses could not be reasonably viewed as denials, the jury presumably would have followed the court's instruction and would not have considered either Clements's questions or Marin's responses or lack thereof, for any purpose. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 292 [a reviewing court presumes that jurors follow the trial court's instructions].) As a result, the giving of the adoptive admissions instruction could not have prejudiced Marin.

IV.

DISPOSITION

The judgment of the trial court is affirmed.

AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

38